**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JUNIOR AGUIRRE, Derivatively and on Behalf of THE REALREAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> JULIE WAINWRIGHT, MATT GUSTKE, STEVE LO, GILBERT L. BAIRD, III, MAHA IBRAHIM, ROB KROLIK, MICHAEL KUMIN, STEFAN LARSSON, NIKI LEONDAKIS, and JAMES MILLER, <br><br> Defendants, <br><br> and <br><br> THE REALREAL, INC. <br><br> Nominal Defendant. | Civil Action No.: 1:20-cv <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Junior Aguirre ("Plaintiff"), by and through his counsel, derivatively on behalf of nominal defendant The RealReal, Inc. ("RealReal" or the "Company"), submits this Verified Shareholder Derivative Complaint ("Complaint") against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by RealReal to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by RealReal; (iii) a securities class action lawsuit filed in the United States District Court for the Northern District of California captioned *Sanders v. The RealReal, Inc.*, No. 5:19-cv-7737-EJD (N.D. Cal.) (the "Securities Class Action")

alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, from June 27, 2019 through November 20, 2019 ("Relevant Period"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning RealReal.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff, on behalf of nominal defendant RealReal against certain current and former members of the Company's Board of Directors (the "Board"). This derivative action arises from the Individual Defendants' breaches of their fiduciary duties of loyalty, candor and good faith and abuse of their control of RealReal in connection with their causing, approving, and/or acquiescing in RealReal's issuance of false and misleading statements regarding the Company's product authentication process.

2.      RealReal describes itself as the world's largest online marketplace for authenticated, consigned luxury goods. On June 27, 2019, RealReal held its Initial Public Offering ("IPO"), selling 17.25 million shares at $20 per share for approximately $345 million in gross offering proceeds. The IPO was issued in connection with a Registration Statement filed by the Company with the SEC, and a Prospectus that was incorporated into the Registration Statement.

3.      According to the Prospectus, RealReal takes in used luxury goods from various consignors, processes those items at its facilities, then resells the items on the RealReal's website for varying commission fees. RealReal purports to "authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics" for the items it receives from consignors.

4.     The Company's authentication process is the lynchpin to its success and sustainability. The Prospectus says right upfront: "We build trust by expertly authenticating every item. Each item is put through a rigorous, multi-point authentication process by our highly trained gemologists, horologists, brand experts or art curators." Likewise, the Prospectus, the Company's website, and its officers' public comments continually boasted that, "[o]ur highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive."

5.     In truth, the Company's authentication process was not nearly as robust as the Individual Defendants professed, with only a small proportion of the thousands of items processed by the Company each day actually going to its small group of expert authenticators.

6.     The vast majority of items supposedly "authenticated" by the Company were merely reviewed by the Company's copywriters, whose main job is to write the descriptions of the products for posting on the Company's website. These copywriters are low-wage hourly employees, often with little or no experience in fashion or luxury products. They received at best 1-3 hours of training on the immense number of products and brands they were expected to authenticate, and much of this training was focused on how to process the items for sale on the Company's website as fast as possible.

7.     In fact, former RealReal copywriters reported quotas ranging from 120 items up to as many as 300 items per day. Given those numbers, copywriters could only devote approximately 2-4 minutes to any given item. Within those 2-4 minutes, they were responsible for not only authenticating the item, but also measuring it, entering various information and data points into the Company's complex spreadsheets, and writing descriptions of the items (or in other words, copywriting) for listing on the Company's website.

8.     As the inevitable result of this highly-pressurized "authentication" process, hundreds of counterfeit items were processed and sold to RealReal customers. The Company even circulated an internal "Faux and Tell" document highlighting counterfeit items that had been sold to customers.

9.     As one would expect, as the Company sold more and more counterfeit items, the truth about RealReal's authentication process began to leak out. A series of media articles, culminating in an extensive investigative report conducted and published by CNBC, revealed that these untrained, inexperienced, and overworked copywriters were performing the bulk of the "authentication" efforts at the Company.

10.     Any defense by the Individual Defendants that they were unaware of the Company's authentication problems is implausible. All the way back in 2018, Chanel sued RealReal with allegations of trademark infringement, counterfeiting, false advertising and unfair competition, among other things. Despite legal pushback about the Company's authentication process from the industry, the Individual Defendants knowingly failed to remedy the Company's authentication problems and caused the Company to issue the false and misleading statements complained of herein.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law, RealReal has sustained damages as described below.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 on two grounds. First, such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law. Specifically, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to RealReal and its shareholders by allowing RealReal to violate

the federal securities laws. Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g). Plaintiff also asserts pendant common law claims under 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

15.     Finally, the Amended and Restated Certificate of Incorporation of The RealReal, Inc. includes an exclusive forum selection clause requiring all derivative actions be brought in "the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, another state court located within the State of Delaware or, if no court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware)."

## PARTIES

16.     Plaintiff is a stockholder of RealReal, was a stockholder of RealReal at the time of the wrongdoing alleged herein, and has been a stockholder of RealReal continuously since that time.

17.     Nominal Defendant RealReal purports to operate as an online marketplace for consigned luxury goods. The Company is a Delaware corporation with principal executive offices

located at 55 Francisco Street, Suite 600, San Francisco, CA 94133. The Company maintains four merchandising and fulfillment facilities where items are received from consignors and processed for listing on the Company's website. Two of the main processing facilities are located in Secaucus, New Jersey, and in Brisbane, California. RealReal's common stock trades on NASDAQ under the ticker symbol "REAL."

18.     Defendant Julie Wainwright ("Wainwright") founded the Company and has served as its President, Chief Executive Office ("CEO"), and Chairperson of the Board since March 2011.

19.     Defendant Matt Gustke ("Gustke") has served as the Company's Chief Financial Officer ("CFO") since April 2013.

20.     Defendant Steve Lo ("Lo") has served as the Company's Vice President, Corporate Controller, and principal accounting officer since May 2019.

21.     Defendant Gilbert L. (Chip) Baird III ("Baird") has served on the Company's Board since June 2018. He serves as Chair of RealReal's Corporate Governance and Nominating Committee and is a member of its Compensation, Diversity and Inclusion Committee. Baird co-founded and has been the Co-head of PWP Growth Equity, the middle market private equity group of Perella Weinberg Partners Capital Management since February 2012.

22.     Defendant Maha Ibrahim ("Ibrahim") served as a Company director from July 2012 until she resigned effective June 16, 2020. Defendant Ibrahim served on RealReal's Audit Committee. Ms. Ibrahim is currently a General Partner at Canaan Partners, an early stage venture capital firm, a position she has held since March 2000. Ms. Ibrahim also serves on the boards of a number of private companies.

23.     Defendant Rob Krolik ("Krolik") has served on the Company's Board since January 2019. He serves as the Chair of the Audit Committee.

24.     Defendant Michael A. Kumin ("Kumin") has served on the Company's Board since May 2017. He serves as the Chair of RealReal's Compensation, Diversity and Inclusion Committee and is a member of its Corporate Governance and Nominating Committee. Kumin has worked as an investment professional at Great Hill Partners, a private equity firm, since 2002 where he currently serves as a Managing Partner. Kumin has served on the board of directors of Wayfair, an ecommerce home goods company, since June 2011 and also serves on the boards of a number of private companies.

25.     Defendant Stefan Larsson ("Larsson") served as a director of RealReal from May 2019 until he resigned effective June 16, 2020. Defendant Larsson served on RealReal's Corporate Governance and Nominating Committee.

26.     Defendant Niki Leondakis ("Leondakis") has served on the Company's Board since April 2019. She was selected to serve on our board of directors because of her executive skills and understanding of quality customer experience. Defendant Leondakis serves on RealReal's Audit Committee.

27.     Defendant James R. Miller ("Miller") has served on the Company's Board since May 2019. He serves on the RealReal's Audit Committee. Miller is the Chief Technology Officer at Wayfair, an ecommerce home goods company and previously served as the interim Chief Technology Officer at Wayfair from August 2019 to April 2020.

28.     Defendants Wainwright, Gustke, Lo, Baird, Ibrahim, Krolik, Kumin, Larsson, Leondakis, and Miller are collectively referred to hereinafter as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of RealReal were required to, among other things:

a.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.   conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

32.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.    In addition, the Company has also adopted a Code of Business Conduct and Ethics (the "Code"). The Code begins with a message from Defendant Wainwright:

**Message from the CEO**

We are building a company that is transforming the way consumers across the world shop – and we are doing it together. We are creating a platform and service on a global scale based at its core on sustainability, authenticity and integrity. This is the very foundation of The RealReal.

As we continue to grow our business, the authenticity and integrity we bring to all that we do, and conduct consistent with the highest ethical standards, is fundamental to The RealReal's place in the market, to its success, and is reflected in this Code of Business Conduct and Ethics ("the Code").

34.     The Code goes on to state, in pertinent part:

**I. Our Commitment to Authenticity**

**THE REALREAL HONOR CODE**

**Authenticity and integrity in everything we do.**

Authenticity and integrity are at the very foundation of The RealReal ("TRR" or the "Company"). We expect this of all our employees, partners and associates. We are committed to legal and ethical conduct in every aspect of our business. This Code of Ethics and Business Conduct, or the Code, summarizes the standards The RealReal expects of everyone, regardless of your role and regardless of your location.

All The RealReal employees working with or on behalf of The RealReal are expected to understand and follow the Code. Likewise, the contractors, agents and partners we do business with are expected to comply with the Code whenever conducting business on behalf of The RealReal.

\*\*\*

**OUR MISSION AND VALUES**

**Our mission is to create greater access to authentic luxury goods, extending their lifetime and value through our innovative global marketplace, and to drive and expand the circular economy.**

Our values drive our mission:

- **Authenticity** We stand behind the authenticity of the products sold on our site and we strive for authenticity in everything we do.

- **Trust** We work hard to earn and keep the trust of our consignors and customers.

- **Respect** We respect the history and heritage of the brands we sell, the trust of our customers and consignors and the commitment and loyalty of our employees.

- **Sustainability** We celebrate and value the history, quality and craftsmanship of the luxury goods entrusted to us by our consignors.

- **Service** We are committed to providing world-class service and strive for constant improvement to benefit our consignors and customers and enhance our users' experience.

- **Collaboration** We value passionate people and new ideas and celebrate boldness, creativity and collaboration.

- **Game Changing** We are changing the luxury consignment industry with innovative technology, personal service, efficient operations and nimble execution.

- **Commitment to Action** We produce and measure results through focus and energy.

- **Passion** We are a leader in our space committed to building a world-class company and setting the standard by which all others are measured.

35.     Furthermore, as noted in the Company's DEF 14A filed with the SEC on April 29, 2020 (the "2020 Proxy"):

**Role of the Board in Risk Oversight**

One of the key functions of our board of directors is informed oversight of our risk management process. The board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure. Our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our external audit function. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

36.     Moreover, the Board's Audit Committee, which is and had been comprised of defendants Ibrahim, Krolik, Leondakis, and Miller during the Relevant Period, has a heightened duty under the Audit Committee Charter, which begins:

**Audit Committee Charter**

**Purpose**

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of the Company is to assist the Board in its oversight of (i) the Company's accounting and financial reporting processes and the audit of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the qualifications and independence of the Company's external auditor (the "Independent Auditor"), and (iv) the performance of the Company's internal auditing department (or other Company personnel responsible for the internal audit function) ("Internal Audit") and the Independent Auditor.

37.     The Audit Committee Charter then goes on to state in pertinent part:

**Duties and Responsibilities**

In furtherance of its purpose, the Committee shall:

20. Discuss policies with respect to risk assessment and risk management, the Company's major litigation and financial risk exposures and the steps management has taken to monitor and control such exposures, it being understood that it is the job of management to assess and manage the Company's exposure to risk and that the Committee's responsibility is to discuss guidelines and policies by which risk assessment and management are undertaken.

*        *        *

24. Review periodically with the Company's general counsel, or appropriate delegates, the Company's compliance with legal and regulatory requirements.

*        *        *

26. Report regularly to the Board, both with respect to the activities of the Committee generally and with respect to any issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Independent Auditor or the performance of Internal Audit.

38.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty and the other violations of law as described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and insider trading; (ii) conceal adverse information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of RealReal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RealReal and was at all times acting within the course and scope of such agency.

## SUBSTANIVE ALLEGATIONS

### A.   COMPANY BACKGROUND

44.     The RealReal, is an online and brick-and-mortar marketplace for authenticated luxury consignment. The Company sells consigned clothing, fine jewelry, watches, fine art and home decor. The RealReal purportedly employs an in-house staff of experts including horologists, gemologists, art curators and luxury fashion authenticators who inspect items for authenticity and value.

45.     The RealReal was founded in 2011 by defendant Wainwright, an e-commerce entrepreneur. By July 2018, the Company had raised $288 million in venture capital funding.

46.     In 2017, RealReal opened its first permanent retail store in New York City. It also opened pop-ups in San Francisco and Las Vegas. In 2018, it opened its second retail location in Los Angeles. In 2019, RealReal opened a third retail location, its second in New York, on Madison Avenue on the Upper East Side. In 2020, RealReal opened a fourth retail location in San Francisco's Union Square and a fifth in Chicago on the Magnificent Mile.

47.     In early 2019, the Company announced it would be adding a half-million square foot e-commerce space in Perth Amboy, New Jersey, to its existing e-commerce centers in Secaucus, New Jersey, and Brisbane, California.

### B.   CHANEL SUES THE COMPANY REGARDING ITS AUTHENTICATION

48.     The Individual Defendants always knew about the Company's authentication problems and have knowingly or recklessly failed to fix its lack of rigorous authentication despite

the Company having built its success on its authentication position. Indeed, the Company has been aware of authentication issues since RealReal was sued in November 2018 by Chanel for selling fake handbags.

49.     Specifically, Chanel sued the Company for trademark infringement, counterfeiting, false advertising and unfair competition, among other things. In the lawsuit, Chanel claimed that The RealReal's staff, which touts on its web site that it uses "authentication experts" to ensure every item is "100 percent the real thing," isn't qualified to tell the difference between a real or fake Chanel. Chanel said it found several counterfeit Chanel bags on The RealReal website.

50.     Despite the very public lawsuit, which is still pending, which put the Individual Defendants on notice that the Company was not authenticating its items as rigorously as claimed, the Individual Defendants still went ahead and issued the false and misleading statements in connection with its IPO and during the Relevant Period as alleged herein in breach of their fiduciary duties.

51.     Notably, in March 2020, the judge overseeing the case denied, in part, the Company's motion to dismiss holding that "Chanel "adequately alleges that [The RealReal] marketed and sold counterfeit Chanel products, and because [The RealReal's] advertising regarding the authenticity of the products it sells is literally false."

C.     **REALREAL'S REGISTRATION STATEMENT**

52.     On May 31, 2019, RealReal filed a registration statement for its IPO with the SEC on Form S-1, which, after several amendments, was declared effective on June 27, 2019 ("Registration Statement"). On June 28, 2019, RealReal filed the prospectus for the IPO with the SEC on Form 424B4 ("Prospectus"). The Prospectus was dated June 27, 2019. The Prospectus was incorporated into and formed part of the Registration Statement.

53.     By way of the Registration Statement, the Company offered and sold 17.25 million shares at $20 per share for approximately $345 million in gross offering proceeds.

54.     The Prospectus stated that, "**You should rely only on the information contained in this document or to which we have referred you. Neither we nor the underwriters have authorized anyone to provide you with information that is different.**" (Emphasis in original).

55.     According to the Prospectus, RealReal offers a "unique service model" as an alternative to brick and mortar consignment stores or self-listing on peer-to-peer platforms for selling used personal luxury goods.

56.     This "unique service model" is predicated on the fact that once the consignor's items reach the Company's merchandising and fulfillment facilities, RealReal purports to "authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics."

57.     The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

58.     In the Registration Statement, the Company repeatedly emphasized how important the Company's authentication process was in maintaining the trust of its customers. Specifically, the Company stated that "*[o]ur highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive*. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase preowned luxury goods." (Emphasis added).

59.     These misrepresentations were paramount given the Company used its purported authentication process to differentiate itself from its competitors in the luxury resale market. Under

"Challenges with Existing Luxury Resale Models," the Company noted that its competitors faced a significant problem with "***Lack of trust for buyers.*** Due to the pervasiveness of counterfeit luxury goods and inconsistent authentication standards, buyers can be hesitant to purchase pre-owned luxury goods. … Peer-to-peer marketplaces and consignment stores do not authenticate effectively as they do not take physical possession of the item, have inconsistent authentication standards or do not employ expert authenticators." (Emphasis in original).

60.     RealReal claimed in the Prospectus that its "Solution … to address the specific challenges inherent in existing luxury resale models," was its "Unique Service Model." The Company claimed that, as opposed to its competitors, "***We do the work on behalf of consignors.*** Once consigned items reach one of our four merchandising and fulfillment facilities, we authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics, making the process seamless for the consignor." (Emphasis in original).

61.     Again touting the importance of the Company's authentication process to building and maintaining the trust of its customers, the Prospectus stated:

> *We build trust by expertly authenticating every item.* We employ more than 100 gemologists, horologists, brand experts and art curators. Our authenticators are highly trained, experienced experts in their respective fields. ***Each item we receive is put through a rigorous, multi-point authentication process before it is curated onto our online marketplace.*** As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods.

(Emphasis added).

62.     Further underlining the importance of gaining and keeping their customers' trust, the Company stated in the Prospectus that:

> ***Trust***
> Trust is the cornerstone of our online marketplace. Consignors trust that we will treat their items with the utmost care and quickly sell them at the optimal price. ***Buyers trust us because we have a rigorous authentication process.*** We believe

the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated.

(Emphasis added).

63.     In the Prospectus, under the sub-heading "How Our Business Works," the Company claimed that "We authenticate every item we sell."

64.     The Prospectus went on to say "[o]ur success depends on the accuracy of our authentication process, and failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability." Accordingly, knowing that the accuracy and adequacy of the Company's authentication process was substantially overstated is a fact that would have been critically important to investors. The risk that RealReal's customers would lose trust in the Company upon revelation of the Company's true authentication process was a significant risk.

65.     In the Prospectus, under the sub-heading, "Inbound Merchandising Operations," the Company made additional false and misleading claims about its authentication process. Specifically, the Company stated that:

> *Authentication*. **We authenticate every item we sell to continue building trust in our online marketplace.** We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. **All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment.**

(Emphasis added).

66.     The Prospectus also misleadingly implied that authentication and copywriting were two separate and distinct operations by listing, under the sub-heading "Inbound Merchandising Operations," separate bullet points for "Authentication" and for "Photography and copywriting." The Prospectus gives the clear impression that the authenticators and the copywriters are different people. The Prospectus also stated that "[o]nce we receive consigned items, our merchandising team leverages our technology platform and data analytics capabilities for a first point of

authentication and to efficiently write copy, photograph and price the items before they are curated onto our online marketplace." The Prospectus also included the following diagram:

**Inbound Merchandising Operations**



67.     The Prospectus also included inadequate and misleading descriptions of the Company's "Risk Factors." Specifically, the Prospectus described the *potential* risk that the Company might fail to identify counterfeit items sent in from consignors, as counterfeiters become more sophisticated, and despite the Company's heavy investment in its authentication process. The Prospectus stated that the Company's sale of counterfeit goods *may* potentially damage the Company's reputation and standing with its customers, which *could* negatively impact the Company's brand, reputation, and business.

> ***As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability for the sale of counterfeit goods.***
>
> Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of product to a buyer if the buyer questions its authenticity and returns the item. ***The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for***

> *authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.*

(Emphasis added).

68.     The Prospectus also failed to "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations" and to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," as mandated by Item 303 of Regulation S-K (17 C.F.R. § 229.303) and the SEC's related interpretive releases thereto.

69.     Under Item 303, the Individual Defendants had a duty to disclose, but failed to disclose, that the Company did not have a rigorous authentication process as represented, the Company had been selling hundreds of counterfeit items through its authentication processes in place at the time of the IPO, and was thus negatively impacting the Company's brand, reputation, ability to attract new and repeat customers, and ultimately, the Company's business and operating results. This information would have been important for investors to know at the time of the IPO.

**D.     ADDITIONAL FALSE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S AUTHENTICATION PROCESS**

70.     The Individual Defendants also made a number of additional false and misleading statements and omissions of material fact during the Relevant Period about the Company's authentication process after the Company's stock began trading.

71.     On the day of the Company's IPO, defendant Wainwright appeared on CNBC's "Squawk on the Street" television segment. On the show, Wainwright stated that "every single item on the site has already been inspected, authenticated before it gets on the site. … We employ

over 100 experts … our brand authenticators also train people, so it happens every single day, on

a regular basis, and we put it through a rigorous multi-point inspection process."

72.     These statements were false and misleading because Wainwright failed to disclose

that (1) the small group of authenticators employed by the Company did not authenticate every

item, or even most items; and (2) the copywriters who actually did inspect and purportedly

"authenticate" the vast majority of the items did not put the items through a "rigorous multi-point

inspection process," but rather they had little experience, received inadequate training in

authentication of the thousands of products and brands accepted by the Company, and operated

under a strict quota system that did not allow copywriters to spend sufficient time with each item

in order to adequately authenticate the item.

73.     On August 14, 2019, the Company filed its first Form 10-Q with the SEC. The

Form 10-Q highlighted the importance of RealReal's authentication process to its business model:

> In addition to scaling our physical infrastructure, growing our single-SKU business
> operations requires that we attract, train and retain highly-skilled personnel for
> purposes of authentication, copywriting, merchandising, pricing and fulfilling
> orders. We are also investing substantially in technology to automate our operations
> and support growth. While we expect our operations and technology development
> expenses to increase as we continue to grow, we expect such expenses to decrease
> as a percentage of total revenue over the longer-term.
>
> *        *        *
>
> Each luxury item that we offer through our online marketplace is unique and
> requires multiple touch points, including inspection, evaluation, authentication,
> photography, pricing, copywriting, application of a unique single-SKU and
> fulfillment.
>
> *        *        *
>
> ***As an online marketplace for pre-owned luxury goods, our success depends on
> the accuracy of our authentication process. Failure by us to identify counterfeit
> goods could adversely affect our reputation, subject us to adverse publicity, and
> expose us to liability for the sale of counterfeit goods.***

Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

*      *      *

For buyers, maintaining our brand requires that we foster trust through authentication, timely and reliable fulfillment of orders, and responsive and effective customer service. If we fail to provide consignors or buyers with the service and experience they expect, or experience consignor or buyer complaints or negative publicity about our online marketplace services, merchandise, delivery times or customer support, whether justified or not, the value of our brand would be harmed and our business may suffer.

(Emphasis added).

74.    These statements contained in the Form 10-Q were false and misleading because they gave the impression that the Individual Defendants understood the importance of the Company's authentication process and had accordingly built the Company's business around a rigorous authentication process for the selling of products when in reality (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the

Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

75.     On September 26, 2019, Wells Fargo hosted a Consumer Conference, during which defendant Gustke engaged in an extended conference call discussion with a Wells Fargo securities analyst and answered questions about the Company's authentication process.

76.     During the call, Gustke described the importance of customer trust to the Company's business: "At the basis of the business is two pillars. For buyers it is trust and we establish that through taking possession of goods and authenticating through a no risk multi-point process -- absolutely, every item." Gustke went on to state that "buyers come to us and give us a chance because they trust us and they trust us because we authenticate every item."

77.     These statements were false and misleading because Gustke failed to disclose that (1) the Company's authentication process was not "no risk," and in fact the Company maintained an internal, regularly updated list of hundreds of purportedly authenticated items returned by customers as counterfeit; (2) the Company did not authenticate every item through a "no risk multi-point process," because the small group of authenticators employed by the Company did not authenticate every item, or even most items; and (3) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

78.     Later during the same call, the Wells Fargo analyst asked Gustke about investors' concerns that "there's a lot of risk because of authenticators are asked to do a lot of things on a

day-to-day basis." Defendant Gustke responded by explaining the Company's purported authentication process:

> It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do. So here's how it actually works. So, every product that is brought into us we see physically and it goes through a multi-point brand specific or product specific inspection. And that product can be touched by multiple people throughout its journey before it even makes it to the site.

> \*       \*       \*

> If it doesn't trip any of those flags it's going to move on to the copywriting function. Copywriters do a bunch of things. In addition to authentication they are setting price -- less and less frequently because algorithms are doing that. They are creating the taxonomy for items, they are writing a description, a title, taking measurements, etc., and they are trained in a specific category.

> **So, you have a copywriter who specializes in women's contemporary or in handbags or sneakers and they receive deep training in their area of specialization.** And the people doing that training are the experts. The experts in turn will be reviewing high-risk items personally.

79.     These statements were also false and misleading because defendant Gustke failed to disclose that the Company's copywriters did not receive anything approximating "deep training" in authentication in their assigned category, and many copywriters had little to no prior experience with authenticating items.

80.     The Company's website, which was approved by the Individual Defendants and available to all of the Company's customers and investors throughout the Relevant Period, also published false and misleading statements about the Company's authentication process.

81.     During the Relevant Period, the Company's "About Us" web page stated, "Authenticity Is Everything To Us. Our 100+ in-house experts including gemologists, horologists and luxury brand authenticators inspect thousands of items every day, ensuring everything we sell

is 100% authenticity guaranteed."[1] This web page was archived by The Internet Archive, a non-profit organization which provides over 20 years of web page history through the Wayback Machine.[2]

82.     This statement was false and misleading because the Company failed to disclose that every item sold by the Company could not be "100% authenticity guaranteed" because (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

83.     On August 13, 2019, the Company held an earnings conference call to discuss the Company's financial results from the second quarter of 2019. During her opening remarks on the call, defendant Wainwright stated that "buyers trust us because we have a rigorous authentication process. We employ more than 100 gemologists, horologists and authentication experts, who authenticate each item we sell."

84.     These statements were false and misleading because Wainwright failed to disclose that the Company did not have a rigorous authentication process. In truth, (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company sells; and (2) the copywriters who actually did inspect and purportedly "authenticate"

---

[1] *See* https://web.archive.org/web/20190821030143/https://www.therealreal.com/about (showing the web page https://www.therealreal.com/about as it existed on August 21, 2019).

[2] *See* https://archive.org/about/.

the vast majority of the items the Company sells did not use a "rigorous authentication process," but rather had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

85.     Defendant Wainwright also stated on the call that, "[f]or our consigners, we make consignment easy and frictionless by providing them with an end to end solution. From advising them on the products to consign to in-home pickup, shipping to our warehouse, authentication, copywriting, pricing, photography and pick, pack and ship."

86.     This statement was false and misleading because it gave the impression that authenticating and copywriting were separate responsibilities and processes, assigned to separate groups of differently trained and qualified employees, when in fact it was minimally-trained copywriters who purportedly "authenticated" the vast majority of items the Company received, and under the quota system they had insufficient time to adequately authenticate, measure, catalog, and write copy for each item.

87.     On November 4, 2019, the Company held an earnings conference call to discuss the Company's financial results from the third quarter of 2019. During the question and answer portion of the call, an analyst asked a question "about the authentication process and the potential for inauthentic items to make it into inventory and be purchased."

88.     In response, defendant Wainwright stated once again that "authentication is core and central to our brand," underlining the importance to customers and to investors of the Company's purported authentication process.

89.     Defendant Wainwright then outlined the Company's authentication process, noting that an unspecified number of "high risk" items go to the Company's authenticators, and that "other items are authenticated by our copywriters. These – this team which is very large are trained in specific categories and specific brands."

90.     This statement was misleading because defendant Wainwright failed to disclose that (1) the vast majority of items were not sent to the Company's authenticators; and (2) the copywriters who purportedly "authenticated" the vast majority of items had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

91.     On November 12, 2019, in response to concerns from customers and investors over the 11/5 CNBC article (as defined below), the Company issued a press release containing a letter from defendant Wainwright to the Company's customers and consignors. *Available at* https://investor.therealreal.com/news-releases/news-release-details/realreal-sets-record-straight-itsauthentication-process.

92.     In her letter, Wainwright wrote that "We are the only resale company in the world that authenticates every single item we sell."

93.     This statement was misleading because defendant Wainwright failed to disclose that the Company does not truly authenticate every item it sells. In reality, (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the

Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate the item.

94.     In describing the Company's "rigorous, brand-specific authentication process," Wainwright stated that:

> • Items that are considered "low risk," such as contemporary brands with clear authenticity markers, are sent to be authenticated by ***our copywriters, who receive deep training in authentication***, but whose title has become outdated.
>
> For context—when we originally launched our business, our copywriters only wrote copy. As our business has grown, the associated scope of their job has changed. ***Copywriters have been receiving the initial and ongoing training required to authenticate products***, which has become an important element of their job.

95.     These statements were false and misleading because defendant Wainwright failed to disclose that the copywriters did not receive and had not been receiving "deep training in authentication" or the "ongoing training required to authenticate products."

## E.     MEDIA REPORTS REVEAL THAT THE INDIVIDUAL DEFENDANTS' STATEMENTS ABOUT THE COMPANY'S AUTHENTICATION PROCESS ARE FALSE AND MISLEADING

96.     On September 13, 2019, the website Fashionista published an article entitled "The RealReal's Authentication Practices Are Not What They Seem, According to New Investigation." *Available      at      * https://fashionista.com/2019/09/the-realreal-authentication-process-exposed. ("Fashionista article").

97.     The Fashionista article summarized an investigative report released by The Capitol Forum, a private D.C.-based consumer protection organization. The Capitol Forum report was, and is, accessible only to its subscribers and not directly to the public.

98.     According to the *Fashionista* article, The Capitol Forum report alleged that RealReal copywriters, rather than professional authenticators, were responsible for

"authenticating" the majority of the Company's items. The Capitol Forum reportedly interviewed seven former RealReal copywriters, "all of whom said they didn't feel it was appropriate for them to be authenticating." These former copywriters explained that the authentication training they received was minimal.

> "They give you a quick 5-minute presentation on what things should look like and then have you go. [...] I should not have been authenticating an Hermes scarf, for example, but all they care about is the product getting on the site," said one former employee. Additionally, according to the former employees, the job had such a high turnover rate that experience levels remained low.

> "The pay was so low and the work so grueling that everybody thought of it as just a temporary job," said one interviewee, "so no one really took it that seriously because they'd be gone in a couple of months."

99.     The Fashionista article also revealed that copywriters were subject to intense quota requirements that could exceed 120 items processed per day. Those quotas made it extremely difficult for copywriters to adequately perform their authentication responsibilities, in addition to the other tasks they were required to complete for each item.

> Per one former copywriter, "Training was rushed and they put a lot of pressure on meeting our daily goals, so a lot of fake items slipped through the cracks because of all the goods we had to authenticate in one day, which could be 130 to 155 depending on what department you worked in. Our days were super long and draining, so a majority of employees were rushing to meet the quota so that they would not get fired. It was more about not getting fired than authenticating the goods."

100.     The Fashionista article reported that in response to The Capitol Forum report, the Company "confirmed to Capitol Forum that copywriters do authenticate products that it identifies as 'low-risk'" and admitted that "we're not training them on everything, they have guides they can refer to." The Company would not acknowledge the existence of quotas.

101.     The Fashionista article also reported that the Company responded dismissively to The Capitol Forum report, stating to Fashionista: "This company's actions and misrepresentations

are clearly calculated to sell their subscriptions and improperly manipulate the market for the benefit of short-sellers on behalf of their subscribers. These people are not journalists and they are not credible."

102.    On October 23, 2019, *Forbes* published an article on its website titled, "The RealReal Sold Me A $3,600 Fake; Here's Why Counterfeits Slip Through Its Authentication Process." *Available at* https://www.forbes.com/sites/richardkestenbaum/2019/ 10/23/if-fake-bagsare-being-sold-on-the-realreal-how-can-the-resale-business-ever-succeed/#5c6eeeb06acb. (the "*Forbes* article").

103.    The author of the *Forbes* article provided both new details and corroborated the account from The Capitol Forum's report as described in the Fashionista article with two new "informed, confidential sources." According to the *Forbes* article: "They all say the actual process for authentication at RealReal is different from the impression you get by reading the prospectus or visiting the company website."

104.    According to the *Forbes* article:

Here is the nub of the problem: A great deal of the authentication at The RealReal is done by people whose title is "copywriter." According to my sources, a majority of products sold are authenticated by these so-called copywriters. Normally, a copywriter is a person who, well, writes copy. And indeed the copywriters do write the copy–the words that accompany the pictures next to an item for sale on The RealReal's website–but they are also doing authenticating.

The problem is that the copywriters have a small fraction of the training that the more expert people have. That's a problem because, without the training that the true experts have, the copywriters can miss things, which are often things they shouldn't miss.

… everything I've heard and read about the copywriters indicates that they come to the job with little or (usually) no experience in authentication.

105.    In researching for the *Forbes* article, the author was invited to tour the Company's Secaucus, NJ facility. Of his experience there, he stated:

The employees I met were open about having copywriters doing the authenticating, and I saw it myself. They do it by dividing products into what they consider to be "high-risk" or "low-risk" categories. Products that are known to attract forgers–either because they are very desirable, very popular, very expensive or some combination of the three–are sent to high-risk authenticators, who have more training and knowledge.

My sources say that the high-risk authenticators do as good a job as any human can; the problem is that not enough of the products go to them, and that's how fakes get through. As a result, consumers are buying fakes, and no one knows how many because too many products are authenticated by copywriters.

106.    The *Forbes* article summed up the problems it found with RealReal's purported

authentication process:

**Why This Is So Wrong**
There are a host of reasons what's happening is wrong. The first is that it's bad for consumers. Most people don't have access to experts who can tell them that the $3,600 bag they bought is fake. What's even worse is that when a maker of fake bags succeeds in selling a fake on The RealReal, it encourages that maker to produce more fake bags, and that compounds the problem.

The other group of victims is investors. When I read the prospectus, the chart above and The RealReal website, I get the clear impression that the authenticators and the copywriters are different people. There is no mention of having two tiers of authenticators. Investors putting up money in The RealReal might make a different decision if they were told more about how the authentication process works. They would be more likely to suspect that $3,600 bag being sold was as fake as the bag I bought. That would make The RealReal a less interesting investment opportunity.

107.    On November 5, 2019, CNBC published an article challenging the claims by

RealReal and its CEO, defendant Wainwright, that there are "no fakes on our site," and that "every

single item [is] authenticated." The article was updated later that day. *Available at*

https://www.cnbc.com/2019/11/05/the-realreals-no-fakes-pledge-is-threatened-by-poor-

trainingquotas. html. ("11/5 CNBC article").

108.    The 11/5 CNBC article was the result of CNBC's in-depth investigation into the

Company's authentication practices and complaints from customers – including over 1,400 online

reviews – who purchased counterfeit goods from the RealReal's website relying on the Company's

authentication process. The investigation also included interviews of "nearly three dozen former employees, speaking to unsatisfied customers around the country and obtaining an internal company document from 2018 that shows copywriters in the Secaucus, New Jersey, warehouse have been tasked with authenticating some of the items that go on The RealReal's site."

109.    The former copywriters CNBC interviewed "said they had little training on how to spot fakes and were hired to write descriptions of the items to post on the website." CNBC also pointed to other internal Company documents it had reviewed, which "clearly spell out strict quotas that employees have been expected to meet or face discipline—which was revealed for the first time to the investing public. This means some obvious problems with merchandise can be overlooked."

110.    One former copywriting supervisor interviewed by CNBC disputed the Company's authentication claims, explaining that the copywriters did not receive sufficient training to properly authenticate all the items they processed, and that the onerous quota system compounded this problem. As the former supervisor, who had worked for the Company for three and a half years put it: "It's so much product. It's really hard for someone to properly authenticate something when they're not probably the best qualified to be even doing that in the first place. And they're being rushed to hit a goal." Continuing, the former supervisor said, "I don't think anyone had enough training at the end of the day. The fakes are getting really good. And when you have such a high volume that you have to get through and you're worried about hitting your goal, at the end of the day, I don't really think they cared whether it was real or not anyway."

111.    As another former copywriter stated in the 11/5 CNBC article, "We had such a big number to hit every single day, 10 hours a day, four days a week, you know? And it's overwhelming. And all you focused on is, 'I have to hit this goal, so I could be good for the

month.'" The former copywriter also said "I wouldn't say I had enough" training to effectively authenticate the items she worked on.

112.     The 11/5 CNBC article also explained that only certain brands or certain types of items were sent to the authenticators, and that the rest of the items were purportedly "authenticated" by the Company's copywriters.

113.     According to the 11/5 CNBC article:

Internal documents stated copywriters have been subject to disciplinary action if a minimum of 50% of their daily quota was not met.

"It is expected that copywriters will reach their daily quota during their shift," a document marked "updated Feb. 1, 2019" stated. "Daily quotas are set depending on the category the copywriter is in. Copywriters are expected to consistently reach their daily quotas."

In the ready-to-wear category, the daily quota was 105 items for an eight-hour shift and 131 items for a 10-hour shift. In contemporary ready-to-wear, it was 128 items for an eight-hour shift and 160 items for a 10-hour shift.

114.     Another former employee quoted in the 11/5 CNBC article stated that these "authentication" practices were not new, and she had seen them in place as early as 2015. "So instead of the top-tier authenticators taking a long time, a sufficient amount of time to review each piece, most pieces were being handled by the copywriters, and only very, very high-value items, it seemed, were being authenticated by the actual lead authenticators," she said. "It was very surprising because I was under the impression, even as an employee, that every item was authenticated by an expert. And it didn't really seem to be the case when we saw what was actually happening."

115.     On November 21, 2019, at 6:31 a.m., CNBC published a follow-up article to the 11/5 CNBC article, titled "The RealReal's 'Faux and Tell' reports disclose fake items published

on the site and returned." *Available at* https://www.cnbc.com/2019/11/20/the-realreals-faux-and-tell-disclosesfakes-published-on-the-site.html. ("11/21 CNBC article").

116.    The 11/21 CNBC article revealed that the Company maintained internal documents, called "Copywriting Faux and Tell," that provided "a weekly recap of TRR published and returned counterfeits." These "Faux and Tell" documents were sent to copywriters at the Company's facility in Brisbane, California. The 11/21 CNBC article gave details and examples from the expansive "Faux and Tell" documents, which "offer a sampling of the types of counterfeit products that slipped through the company's vetting process. These include mistakes that may appear to be obvious."

> A total of 227 pages from the first and third quarters of 2019 show specific examples of what are labeled 'TRR fakes.' The items include purported Louis Vuitton slides in a style that was never created. Ugg boots marked with the wrong logo and bow. Moncler track pants tagged with a label that says T-shirt. A separate pair of slides from "The Row" and a Valentino scarf were supposed to be made in Italy but the label on the TRR fakes say they were "Made in China."

117.    Regarding the "Faux and Tell" documents, the 11/21 CNBC article also noted that a former employee who worked at the Company's Secaucus, New Jersey, facility reported seeing similar documents during presentations to staff.

118.    The 11/21 CNBC article also reported the Company's apparent efforts to change their messaging about their authentication process following the 11/5 CNBC article:

> The RealReal has advertised on its Facebook page that it "is the leader in authenticated luxury consignment. With an expert behind every item, we ensure everything we sell is 100% real."

> The reference to "100% real" was removed from the page on Nov. 5, the day the CNBC investigation aired. Claims of everything "100% authentic" also have been scrubbed from the company's website.

**F.    REALREAL'S FORMER EMPLOYEES CORROBORATE THE MEDIA INVESTIGATIONS REGARDING THE TRUTH ABOUT THE COMPANY'S AUTHENTICATION PROCESS**

119.    In addition to the Company's employees and ex-employees interviewed in connection with the above referenced media reports, Plaintiff's counsel in the Securities Class Action had an investigator interview over one dozen former RealReal employees to corroborate the facts reported in The Capitol Forum article, Fashionista article, *Forbes* article and CNBC articles. Portions of those interviews are detailed below.

120.    According to former employee 2[3], outside of certain brands, garments, and specialty leather goods and furs, "everything else in the runs, essentially, did *not* have to go through authentication. Those garments that did not have to go through authentication, we were held [to] that entire responsibility as copywriters to go through that." According to former employee 4[4], "85-90 percent of the product never gets seen by the official authentication team. It goes straight to the copywriters from receiving, because [authenticators] only checked out certain brands." Former employee 5[5] reported that "only a tiny fraction of anything that ever goes on at that site is authenticated. Otherwise, it's copywriters." FE5 recalled that, outside of some high-ticket items, the authentication is performed by "copywriters that don't have any training in authentication."

---

[3] Former Employee 2 ("FE2") served as a copywriter in the Company's Secaucus, New Jersey facility between August 2018 and March 2019. During this time, FE2 worked in the womenswear and menswear units of the copywriting department.

[4] Former Employee 4 ("FE4") served as a copywriter and was later promoted to supervisor in the Company's Brisbane, California facility between late 2016 and March 2018. FE4 worked as a copywriter in women's ready-to-wear clothing, and later served in a customer service role.

[5] Former Employee 5 ("FE5") served as a senior vice president of the Company and was the Company's chief human resources officer. FE5 served in this role from May 2017 through August 2018 and worked primarily in the Company's Brisbane, California facility. FE5 was a member of RealReal's executive committee, which included defendants Wainwright and Gustke as well as FE12. FE5 had regular, direct communications with and met with the executives of the Company, including the Officer Defendants, throughout FE5's time with the Company.

Former employee 6[6] reported the same process, where the "majority" of items were not seen by the authentication team, "which led to a bunch of fake things being put on the website." FE6, who now works close to the Brisbane facility and has maintained close contact with former co-workers, reports that "that's still happening. I work right next door to the warehouse -- I have a bunch of friends over there who say nothing's changed." Former employee 13[7] also reported that the authentication team would only review specific high-end brands that were frequently counterfeited – the rest of the products "authenticated" by the Company were reviewed by copywriters.

121.   This distinction was important because, as former employee 12[8] described, "for a person to have the depth of knowledge to be able to look at something and know exactly where to look to tell if it's authentic, takes time and lots of knowledge and experience in the industry. When you're thinking about a copywriter and authenticator, they're essentially two different roles…different skill sets."

---

[6] Former Employee 6 ("FE6") served as a copywriter and was later promoted to copywriting supervisor at the Company's Brisbane, California facility from late 2017 through August 2019. FE6 is now employed with a different company located close to RealReal's Brisbane facility, and FE6 has maintained close contact with many of FE6's former coworkers at the Company who are still employed by RealReal.

[7] Former Employee 13 ("FE13") served as a photography production assistant, copywriter and was later promoted to senior copywriter at the Company's Brisbane, California facility between December 2017 and November 2019.

[8] Former Employee 12 ("FE12") served as the Company's vice president of fulfillment and was a member of the Company's executive committee. FE12 worked out of the Company's San Francisco headquarters from April 2016 to December 2017. During FE12's tenure with the Company, the Company's executive committee included defendants Wainwright and Gustke, FE5, FE12, and the heads of the Company's various departments including sales, merchandising, technology, and marketing. Defendant Lo also joined the executive committee when he joined the Company. According to FE12, the executive committee held weekly meetings every Monday, where "every functional would talk about their issues."

122.    As FE5 explained, "there's a very, very small team of authenticators. The rest of them are copywriters who predominantly would have no experience in authentication." According to FE5, the copywriters' training in authentication was limited to "a couple of hours," or "like none, almost none." Between the lack of training and the high quota demands placed on workers to get items on the website for sale, FE5 said, "There's no way that things could be authenticated on the site. There were never enough people to do it." As FE5 explained, it simply isn't realistic that a copywriter with three hours of training can reliably authenticate luxury items.

123.    FE5 specifically confirmed that media portrayals of the Company as having a lax to nonexistent authentication operation, referencing the 11/5 CNBC article as an example, were substantially true. Former employee 7[9] also corroborated that the 11/5 CNBC article about the Company's authentication practices was accurate.

124.    FE4 reported being hired as a copywriter in the women's ready-to-wear clothing category with no experience in fashion or authentication whatsoever. Former employee 10[10] corroborated that the Company would often hire copywriters with no experience in fashion, and that many of these people would struggle with authentication and would inadvertently pass counterfeit items on to the Company's website. Former employee 11[11] stated that the copywriters

---

[9] Former Employee 7 ("FE7") served as a copywriter and was later promoted to senior copywriter and then category manager for men's items at the Company's Brisbane, California facility between September 2016 and April 2019.

[10] Former Employee 10 ("FE10") served as copywriter and was later promoted to senior copywriter for the women's ready-to-wear category at the Company's Brisbane, California facility between August 2018 and November 2019.

[11] Former Employee 11 ("FE11") served as a luxury manager working out of the Company's office located in Century City, Los Angeles, California, from 2015 to 2017. Luxury managers at the Company were responsible for meeting with certain consignors in their homes to inspect and pick up high-ticket items to be submitted to the Company. FE11 attended at least one "summit" held by the Company in Las Vegas, at which defendant Wainwright and all of the Company's

responsible for authenticating most items were in large part "not qualified…they come from backgrounds that have nothing to do with luxury products." FE13 recalled that, in an effort to push through as much product as possible onto the Company's website, the Company often hired copywriters who had no knowledge of fashion and no relevant experience in authentication. According to FE13, the Company "hired all kinds of temp people" as copywriters to help deal with the massive volume of products the Company was processing, some of whom "don't know the difference between wool and satin."

125.    In a typical shift, FE4 recalled that there would be approximately 25-30 copywriters on duty, and less than 5 authenticators. On weekends, FE4 stated that those numbers went down to 10-15 copywriters and only 1 authenticator, who was typically the newest hire. During FE6's time at the Brisbane facility, FE6 estimated that "there were probably about five authenticators and probably about 200 copywriters." During former employee 8's[12] tenure with the Company, FE8 estimated that only 5-7 members of the authentication staff were working on a given day, compared to well over 100 copywriters.

126.    FE2 was given a quota of 130 items per day in a 10-hour shift, which, accounting for the minimal breaks allowed meant processing "about one product every 3-4 minutes." According to FE6, the daily quota for a copywriter varied depending on the category of item the copywriter was responsible for and the length of their shift (8 or 10 hours). FE6 reported that in the shoes category, the daily quotas ranged from 120 up to 250 items per day that copywriters were

department heads were present. FE11 also interacted with Wainwright personally when Wainwright visited the Company's Los Angeles office.
[12] Former Employee 8 ("FE8") served as a copywriter for men's items at the Company's Brisbane, California facility between November 2017 and August 2018. FE8 reported to FE7 during FE8's employment with the Company.

expected to authenticate and process. By the end of FE8's employment with RealReal, FE8 was regularly tasked with handling 250-300 items per day. During FE6's employment with the Company, FE6 estimated that the Company was receiving at least 20,000 items per day. "That's where the high quotas come in." During FE6's time at the Company, "the quotas never went down. They always went up." According to former employee 9[13], if the quota for the day was 150 items, "to hit your goals you would be processing something in two to four minutes." FE10 reported having a daily quota of 140 items in a 10-hour shift, "so if you do the math on it, three minutes per item."

127.    According to FE 2, within the 3-4 minutes the copywriters could spend with each item, copywriters were responsible for a number of separate responsibilities on top of authenticating the item. "The expectation for what copywriters were supposed to do was to title the products, to place the item under a 'taxon,' or category… We were tasked to price the product based on historical trend — maybe we received the same product in the past [so] we would look at how long it took that product to sell, and at what price." FE2 explained that copywriters were also charged with writing a short description of each item for buyers to read online: "Part of the job with consigned pieces was to communicate to the end consumer what the condition of the product is. What we tended to do as copywriters was not only look for conditions, look for damages [and also] check for authentication."

128.    FE8 recalled that in addition to attempting to authenticate each item, copywriters were tasked with taking measurements and entering other information into a comprehensive database to prepare them for sale. As FE8 described, for each item, "you're scanning, you're typing

---

[13] Former Employee 9 ("FE9") served as a copywriter primarily for shoes and accessories, later working on handbags and "home and art," at the Company's Brisbane, California facility between May 2018 and June 2019.

the title, you're inspecting for damage. I tried to keep it under a minute for everything. Maybe the longest I spent was five minutes, but that's if I had to do a three-piece suit."

129.    FE7 corroborated this account, stating that the high quotas limited copywriters to less than five minutes per item. "You're trying to measure the item; you're trying to write the product description. Things were passed by very quickly. A lot of copywriters tried to voice our concern -- we're not really doing the customer justice by processing the items as fast as possible... A lot of people took shortcuts, didn't do the full research, didn't authenticate the items properly." As FE9 reported the authentication process copywriters were responsible for was complicated for many items. FE9 explained that copywriters had to search each item for certain indicators of counterfeiting – a certain item may have a certain font on the label, a specific shade of red on the sole of a shoe. "People struggled the most in clothing," FE9 recalled, because they had to inspect "lots of measurements, counting buttons, spacing of buttons." As FE13 explained, "It could be very involved just trying to figure out if a button is real or not based on the season they made it, time period they made it. That's something hard to teach. It takes a lot of time. If you're trying to go fast because you have a quota, you're not going to have the time to sit and look."

130.    Tasked with all these responsibilities and only a few minutes for each item under the quota system, copywriters did not feel that they could spend any extra time on items they deemed questionable. As FE4 recalled, "When you're trying to hit a certain goal in a certain number of hours, you can't spend that extra five minutes to see. So, I guarantee so many counterfeit items get pushed through, because we just don't have the time." FE12 explained that, "we didn't have enough people, and therefore we could not keep up with the volume. … If you don't have enough people, and you're trying to push the volume through, that's where you have a tendency to lapse on critical things."

131.    FE6 echoed this sentiment, stating that "the goals [quota] of each copywriter [were] too high for the number of things" that were expected to be processed, adding "that is just not enough time to do the authentication and hit that number by the end of your eight-hour shift with your 30 - minute lunch and your two breaks." According to FE6, "a lot of the people who were working there -- they feel the same way. They just are confused, and they don't have the proper training; they don't have resources to do the proper job that's expected of them." FE9 confirmed that "all levels of quality were affected by having to be that fast. We did not have time to research stuff sometimes, or to really double check your work." Former employee 1[14] also recalled knowing that copywriters "were intensely overworked [and] … there was not a lot of training on spotting [counterfeits]."

132.    With respect to training, FE2 stated that "I couldn't tell you there was an intensive training process." FE8 agreed, saying that "I wouldn't say I was actually ever trained on authenticating things." Indeed, copywriters received extremely limited instruction on authentication. FE2, FE4, and FE8 reported that their initial training session was a 1-hour PowerPoint presentation. According to FE8, "I'm used to having a full training day, [or] a couple of days. They gave us the packets and told us to read it, and that was pretty much it."

133.    As FE2 reported, the copywriters' bi-weekly follow-up trainings involved "essentially us sort of sitting in a conference room. They put up a presentation ... [but] with the large brand portfolio, it was difficult, as a human being, to maintain all that authentication information." Copywriters were also directed to a document on a Google server with additional

---

[14] Former Employee 1 ("FE1") served in various capacities of increasing responsibility, due to promotions FE1 earned, in the photography department of the Company's Secaucus, New Jersey facility between January 2018 and March 2019, including as a production assistant and as a manager.

information for different brands and garments. Ultimately, FE2 described authentication training as "a process that you had to teach yourself." As FE4 stated, "but there's just so many brands... They would send out little PowerPoints that everyone could access through Google docs, the collections, and just through the daily copywriting, you start to remember those terms for those specific brands, but you don't really get that much training on whether something is fake. It's not thorough by any means."

134.   As FE6 reported, the scant training that RealReal copywriters did receive was less about authentication and more about getting items into the system and listed online as quickly as possible. FE10 explained that new copywriters hired in the apparel category would spend 2-3 hours reading a deck of 80-100 slides that covered information such as the grammar and style expected for ecommerce item descriptions, sizing across different brands offered by the RealReal, dress silhouettes, colors of jeans, and "information about a designer and their signature prints." As FE10 explained, new hires would then spend a one-hour session with a senior copywriter, but that this training was focused much more on how to use the computer system to process items, as opposed to training in authentication. FE13 also noted that the follow-up training that FE13 both received and later was instructed to provide as a senior copywriter was focused in large part on processing items faster, not more accurately. Overall, FE10 reported that "there was no official authentication process, it's really more like trial and error." FE13 echoed this sentiment, stating that the training was "not enough. It's not consistent."

135.   Even when copywriters did receive additional training, including the bi-weekly meetings, copywriters were distracted by the onerous quotas. According to FE9, if the trainings were under one hour, copywriters' daily quotas were not adjusted. FE9 explained that as a result, copywriters were so concerned about meeting their quotas that during the trainings, "you're

counting the minutes and you're not really listening." Moreover, FE9 reported that there were not as many training classes as were needed, and copywriters could not request additional training. According to FE13, copywriters had little to no time to absorb what training they were given, and not enough time to put that training to practical use.

136.    FE4 also reported that new copywriters started on lower-value items, but no extra instruction was given as they moved up. "Once you start doing luxury items, you don't really get any more training beyond that. Honestly, the authentication training wasn't really there." As FE13 explained, the result of the lack of experienced hires, lack of training, chaotic and pressurized work environment, and focus on quotas was a shocking lack of quality in copywriters' authentication work.

137.    There was intense pressure on copywriters to hit their daily quotas. FE2 reported that the daily quotas and work quality were enforced by a ratings system imposed by their managers. According to FE4, at least every hour managers sent an email to the entire copywriting team showing everyone's performance numbers, including calling out individuals by name. FE4 recalled that if copywriters missed their quotas, they were required to speak to their manager before leaving for the day. As FE5 reported, if copywriters didn't consistently meet their quotas, "you wouldn't keep your job." FE6 reported a strict disciplinary system under which copywriters who missed their daily quota would first receive a verbal warning, with additional censures leading up to termination. FE7 added that workers who surpassed their daily quota would reap financial incentives. According to FE13, if copywriters "didn't hit their [quotas] for two weeks straight, they would be remanded to training. At the end of the week, if that same employee still fell short of their monthly quota, they would be immediately terminated instead of receiving a final warning."

138.    FE4 explained that quota was pushed above everything at the Company. Managers would routinely shout at staff and reduced some copywriters to tears. FE4 recalled that the managers were mostly outside hires with no copywriting or authentication experience, who "were just pushing us to hit quotas." FE10 noted that FE10's promotion to senior copywriter was primarily due to FE10's ability to keep up with the quotas. FE13 also reported being promoted to a supervisory role in the copywriting department because of FE13's ability to work fast and keep up with quotas.

139.    FE7 detailed a number of instances illustrating the intensely pressurized work conditions at the Company for copywriters, who were pushed relentlessly to hit their daily quotas. After a stabbing incident between two employees in the Brisbane facility, FE7 reported that workers were instructed to carry on business as usual. When the Company was expanding its Brisbane facility and construction workers on lifts performing noisy work like hammering, FE7 recalled that copywriters were instructed not to be distracted, and were still held to their quotas. Even during the deadly and destructive wildfires that ravaged California in 2018, FE7 reported that "they didn't send us home. We had to stay and work, and the smoke crept all the way here, it was inside the building … They told us we still had to produce. They tried to give us masks that were not even the [approved] N-95 [model]."

140.    As FE9 recalled, "I remember people saying that 'I don't always push things through [to authentication if there's a question], because I'm trying to hit my quota.' I remember people saying, 'I don't even push things anymore, because I don't even have time.'" FE11 confirmed that this pressurized, volume-focused environment extended to luxury managers too, stating that "the pressure to do our numbers was astronomical. There were people who were let go because they did not produce the way they were supposed to. ... The pressure was unreal, unreal."

141.    After several copywriters raised concerns to the Company's human resources department about the unreasonable quotas, which gave workers just minutes to devote to each item and pressured some employees to skip the few breaks they were allowed each day, FE6 recalled an internal investigation led by Mary Chavez ("Chavez"), the Company's Compliance Senior Manager, Employee Relations, in the summer of 2019. However, according to FE6, "nothing changed at all" after the investigation. FE10 also corroborated this description of Ms. Chavez's investigation into complaints about the quota system.

142.    Due to concerns that copywriters felt forced to skip their lunch and other breaks just to meet their quotas, FE7 and a coworker gathered signatures from their colleagues who signed a statement that they had even received written warnings for not making their quota on days when the employee was off of work. FE8 reported that "I was uncomfortable with going to the bathroom because I [might] not make my quota."

143.    After shifting to a customer service role at the Company, FE4 reported that "people would return stuff all the time" as counterfeit. "It just happened way more than it should have for a company that says everything [is] authenticated."

144.    FE6 reported that management would release "Copywriting Faux and Tell" documents about every two weeks, and sometimes more often. These documents were a list with pictures of some of the fake inventory that made it through the Company's purported authentication process and onto its website. The list included numerous items that customers had bought and returned because the items were fake, which managers compiled into the "Faux and Tell" lists.

145.    FE6 provided copies of the "Faux and Tell" lists from the first quarter of 2019, which included approximately 137 items. FE6 explained that many of these items should have been easily identifiable as counterfeit, including, for example:

- A pair of Louis Vuitton slides that were never produced by Louis Vuitton (p. 19);

- A "Philipp Plein 'Kenzo' T-Shirt marketed as such even though, according to the document, "Kenzo and Philipp Plein never collaborated on a collection" (p. 22);

- A pair of "Gucci Princetown Mules" sold in a "colorway" (combination of colors) that was never produced by the company (p. 28);

- An Yves Saint Laurent T-Shirt with an "overall aesthetic" that "is not consistent with an era of Yves Saint Laurent past thru present" (p. 51);

- A pair of Jimmy Choo flats labeled "Jimmy Ghoo" on the sole (p. 115);

- A "Fendi Beaded Peekaboo Bag" with the word "removable" misspelled on the label (p. 121);

- A "Missoni Zip-Up Top" with the brand name botched as "Mssioni" on the label (p.171); and

- Multiple items, including clothing, bags, and shoes, described as coated with plastic film, displaying excessive glue, constructed with "inferior" materials, and/or giving off a "strong chemical odor."

146.    As FE6 reported, "by showing us the fake items that made it onto the site — that was their training. Not everyone would see that list, so they wouldn't get the training. It was a poor way of training on something so huge. And I believe that it's still ongoing. They would do little five minute trainings in the morning, like in the huddle -- no one would really be listening."

147.    FE8 reported that luxury managers, who were responsible for going to consignors' homes to collect items from VIP clients, were working on commission and were strongly motivated to accept as many consignments as possible, without regard to their authenticity. FE11 confirmed this account, estimating that on at least ten separate occasions FE11 personally saw

items submitted by luxury managers that were rejected as fake in the authentication process, but were then resubmitted and sold as "authentic" on a second attempt.

## G.   INDIVIDUAL DEFENDANTS KNOWLEDGE OF THE AUTHENTICATION MISREPRESENTATIONS

148.    At all relevant times, including at the time of the IPO and during the Relevant Period, the Individual Defendants knew, or were reckless in not knowing, that their public statements were false and misleading as outlined herein.

149.    As described in varying detail in The Capitol Forum report, Fashionista article, the *Forbes* article, and the two CNBC articles, the Company's authentication process – having untrained and overloaded copywriters take on the responsibility of authenticating hundreds of items each day that were not seen by the Company's actual authenticators – had been in place for years and was well known to everyone working at the Company.

150.    Indeed, as the Company admitted, its authentication process was "core and central to our brand." As defendant Gustke explained, "It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do." Accordingly, it is unfathomable that the Individual Defendants were not intimately familiar with the Company's true authentication practices.

151.    In fact, many of the former employees who spoke with the Securities Class Action Plaintiffs' investigator confirmed that the Company's executives were unquestionably aware of the Company's flawed authentication process, including the onerous quota system and lack of sufficient training for copywriters.

152.    FE1 reported seeing defendant Wainwright visit the Company's facility in Secaucus, New Jersey, on several occasions. Regarding Wainwright, FE1 stated, "I have no reason

to believe she didn't know exactly what the procedure ... All you would have to know what was the basics [of] our pipeline procedure to know who was authenticating what."

153.    FE3 reported seeing defendant Wainwright visit the Company's facility in Brisbane, California on multiple occasions, often accompanied by other senior executives. FE4 also reported seeing Wainwright do "walkthroughs" during visits to the Company's Brisbane facility. FE6 recalled that Wainwright visited the Brisbane facility multiple times, "probably once a month." FE7 recalled seeing Wainwright at the Brisbane facility periodically, and that "she would check in and ask how the team was doing." FE8 recalled that Wainwright repeatedly visited the Brisbane facility and would do walkthroughs of the facility to get a personal look at the warehouse and operations. FE13 also reported seeing Wainwright take frequent tours of the Brisbane facility.

154.    FE5, a senior executive with the Company, confirmed that each of the executives at the Company were well aware of the Company's flawed authentication process, including the burdensome quota system and lack of sufficient training for copywriters. Regarding the lack of authentication and the onerous quota system, FE5 stated that "every single executive in that company knew about it intimately. There's no secrets. Tons of documentation. That there's quotas is documented all over the place." FE5 also specifically confirmed that defendants Wainwright and Gustke were each deeply familiar with all that was transpiring with the authentication process and quota system.

155.    FE6, who worked at the Company at the time of the IPO and has maintained close contact with some of FE6's former co-workers, stated that the authentication process did not change during or after FE6's employment with the Company. As to the Company's claims about

authentication, FE6 stated, "That's just a lie. They really don't care about authenticating. They just care about pushing things through to make a sale -- even if that item's fake."

156.    FE6 also confirmed that RealReal management were the ones who shared the internal "Faux and Tell" documents every week or two. Indeed, FE6 confirms that the "Faux and Tell" documents were typically sent to the email address "ALL@therealreal.com", which sends the email to every employee at the Company, including multiple categories of workers and multiple layers of management. Examples of these "Faux and Tell" documents from the first quarter of 2019 included approximately 137 counterfeit items listed for sale on the Company's website from that quarter alone.

157.    FE6 described an internal investigation carried out by the Company's management, specifically to address employees' complaints about the quota system and highly pressurized work environment. During the course of this investigation, employees met with Chavez, the Company's Compliance Senior Manager, Employee Relations, one-on-one to go through a list of complaints from employees, asking if the employee had witnessed the issue firsthand. This demonstrates that the Company's management was aware of complaints about the quota system hurting copywriters' ability to perform their many responsibilities, including adequately authenticating hundreds of items each day. According to FE6, "there is no way that she [Wainwright] did not know" about the Company's flawed authentication process, including the burdensome quota system and lack of sufficient training for copywriters.

158.    FE7 reported that the Company's flawed authentication process "didn't match what the business model was portraying to the consumer. When they say, 'We looked at everything,' that wasn't the reality of it. Everyone knew that it was smoke and mirrors."

159.   On March 22, 2019, just three months before the IPO, FE7 and a co-worker gathered signatures from their colleagues to present to management in an attempt to get the Company to take a serious look at the flawed quota system that pushed employees to a breaking point and allowed counterfeits to make it through to the RealReal's website. The email was sent to Ms. Chavez, Vanessa Mendieta – RealReal's People Business Partner and formerly the Company's Senior HR Specialist, Zaina Orbai – the Company's Chief People Officer, and the general HR email address: "hr@therealreal.com." The email referenced prior discussions between FE7 and members of the HR department, and stated that "we would like to reiterate that these are companywide issues, and that many employees are fearful to speak out due to fear of retaliation." FE7 recalled that the Company's management looked into the workers' complaints, corroborating FE6's report of individual interviews conducted by Ms. Chavez.

160.   FE7 also reported that data about counterfeit items that made it onto the Company's website were tracked by the authentication team. The local authentication managers would have access to that data and reported it up the chain of command to senior management.

161.   FE9 reported that each copywriter's performance against their quota was tracked through spreadsheets that were created and shared among managers. "It wasn't our managers randomly saying 'Do more work, reach your quota better' -- they had been called to task in another meeting. There was nobody in the company that didn't know about those quotas." Although I only had access to part of the spreadsheets, FE9 recalled that "the admins would have been The RealReal [leadership] - every one of those managers, everyone used that; it's not like one department used that. Everyone had access to that." Specifically, FE9 named the director of the copywriting department, Rainee Walker, as well as Michelle Jones-Jackson, the director of merchandising, as having access to the spreadsheets.

162.    FE9 also recalled that in the months leading up to the IPO, RealReal executives including defendant Wainwright "were pushing heavy for people to hit the quotas or go above." Specifically, FE9 reported that approximately one month before the IPO, "in a meeting that was either webcast or prerecorded, it was Julie [Wainwright] talking about the IPO in general, [saying] 'That's why we're making this drive and this push, because we don't want customers to have such a long wait.'"

163.    FE10, who worked at the Company at the time of the IPO and through most of the Relevant Period, reported that "[f]rom the very top to the bottom, people [are] aware of the process and how the authentication goes."

164.    According to FE10, defendant Wainwright and other executives "were constantly in the warehouse. They know how the process works; they know how people are hired off a dime... Everyone's aware of that, everyone's aware that it was always a numbers game." FE10 explained that "Rainee [Walker] is the one who enforces [the quotas] throughout the warehouses [in] Secaucus [and Brisbane]. Her direct boss is [RealReal COO] Rati [Levesque], and the person who Rati reports to directly is Julie [Wainwright], so what's why we all know that" the quota directives come from the top down. According to FE10, "Julie [Wainwright] knows that these quotas exist because she's apparently the one who's making them," citing this fact as common knowledge among the employees of the Company's Brisbane facility.

165.    When asked whether the Company's authentication process was known by RealReal executives, FE11 responded "Absolutely, from Julie Wainwright all the way down... To advertise yourself to be [this] accurate is misleading and deceptive, and it's made them millions and millions of dollars." FE11 reported that defendant Wainwright "was very familiar with every procedure, every goal, every interaction."

166.   FE11 specifically recalled Wainwright fielding questions about why the Company's authentication process allowed some luxury managers to successfully re-submit items through the authentication process that were previously rejected as fake. According to FE11, when faced with challenging questions such as these during one of the Company's summits in Las Vegas, which FE11 attended, defendant Wainwright said "'If you aren't on board with the way I'm doing things, get off.'"

167.   FE11 was adamant that, based on FE11's observations and experiences, defendant Wainwright and other top officials of the RealReal were well aware of weaknesses in the authentication process as evidenced by initially rejected goods later being offered for sale and quotas which encouraged workers to take shortcuts to meet goals.

168.   FE12 confirmed that defendant Wainwright "was somebody who was very involved in how the process worked and was designed." When asked who set the quota and productivity goals, FE12 responded that "It would have had to have been Julie [Wainwright]. Julie [Wainwright] was there the entire time. There's no way she could ever say she was not involved in them." FE12 also reported that Wainwright received frequent and regular reports. "There was a lot of reporting mechanism[s] that she got. She would say in meetings, 'Let's have them pull this report so I can look at it.'" Specifically, FE12 recalled that the executive committee, during its regular weekly meetings, would review a report concerning items from the Company's website identified as counterfeit.

169.   FE12 also described fellow executives as "a very hands-on executive team."

170.   As FE4 summed up, "The RealReal — you're supposed to be able to trust them, and I just don't think you necessarily can." FE6 was similarly skeptical of the Company's authentication claims: "That's just a lie. They really don't care about authenticating. They just care

about pushing things through to make a sale -- even if that item's fake." Regarding the Company's public authentication assurances to customers, FE8 stated that "it's not [a fair promise] with knowing what happened in that job. There's just no way in any shape or form that everything on there is accurate." According to FE8, "It was all about the numbers: You had to make your numbers. That's all you heard, was 'numbers, numbers, numbers.'" FE11 described RealReal's purported authentication process as "shady for sure" and "not thorough, and it's not accurate at all." As FE13 stated, with respect to the Company's public claims that "'We're RealReal. All the pieces pass through authentication.' That's not really true."

### DAMAGES

171.    As a result of the Individual Defendants' wrongful conduct, RealReal disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated RealReal's credibility. RealReal has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

172.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected RealReal to costs and expenses incurred in connection with the defense and/or settlement of the Securities Class Action.

173.    As a direct and proximate result of the Individual Defendants' actions as alleged above, RealReal's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

174.    Moreover, these actions have irreparably damaged RealReal's corporate image and goodwill. For at least the foreseeable future, RealReal will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

and have misled the investing public, such that RealReal's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND ALLEGATIONS

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

177.    Plaintiff is an owner of RealReal common stock and was an owner of RealReal common stock at all times relevant hereto. As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

178.    At the time this action was commenced, RealReal's Board consisted of the following eight individuals: defendants Wainwright, Baird, Krolik, Kumin, Leondakis, and Miller (the "Director Defendants"), along with non-parties Caretha Coleman and Carol Melton (together with the Director Defendants, the "Directors").

179.    The Director Defendants are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action, and therefore demand is futile, for the following reasons:

180.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of

the Company concerning its business, operations, prospects, and authentication process were accurate. As explained above, the Director Defendants were on notice that the Company's representations about its authentication process were false and in breach of their fiduciary duties allowed the Company to make the complained of false and misleading statements.

181.    Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

182.    The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.

183.    The Director Defendants consciously and knowingly making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of RealReal to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to the Director Defendants.

184.    Demand on defendant Wainwright is also futile for several reasons. Defendant Wainwright is the Company's founder and has served as the President and CEO and Chairperson of the Board since January 2011. The principal professional occupation of defendant Wainwright is her employment with the Company as its President and CEO, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits. Per the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), defendant Wainwright received compensation of $535,484 and $4,971,673 for the years 2018 and 2019, respectively. These amounts are material to her and therefore she cannot independently consider a demand against defendants Kumin, Leondakis, and Baird who as Compensation Committee members determine her compensation.

185.    Additionally, Wainwright is incapable of considering a demand to commence and vigorously prosecute this action because she faces additional substantial likelihood of liability as she is a named defendant in the Securities Class Action.

186.    Likewise, Defendants Baird, Krolik, Kumin, Leondakis, and Miller are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are each also a named defendant in the Securities Class Action.

187.    Defendants Krolik and Miller, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements, and allowed the Individual Defendants to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Krolik and Miller were obligated to review the Company's quarterly reports to ensure their accuracy. Instead, defendants Krolik and Miller, as members of the Audit Committee, failed to ensure the integrity of

the Company's financial statements and public statements regarding RealReal's purported authentication process, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Krolik and Miller.

188.    Defendants Kumin and Miller also suffer a conflict of interest arising out of an ongoing business relationship. Defendant Kumin currently serves on the board of directors of Wayfair Inc. and serves as the chairman of its compensation committee, while defendant Miller is the Chief Technology Officer at Wayfair, Inc. and previously served as the interim Chief Technology Officer at Wayfair from August 2019 to April 2020. Miller also served on the Wayfair board of directors with defendant Kumin from July 2016 until April 2020. This relationship precludes defendants Kumin and Miller from acting independently and in the best interests of the Company and the shareholders.

189.    Furthermore, defendants Baird, Kumin and Ibrahim lack independence because they were original investors in RealReal and therefore are personally entwined with the Company as noted in the 2020 Proxy Statement:

### CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the executive officer and director compensation arrangements discussed in the section titled "Executive Compensation," we describe below the transactions since January 1, 2019 to which we have been a participant, in which the amount involved in the transaction exceeds or will exceed $120,000 and in which any of our directors, executive officers or holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

**Series H Preferred Stock Financing**

In March 2019, we sold an aggregate of 6,786,721 shares of our Series H preferred stock to certain related persons at a purchase price of $6.8748 per share, for an aggregate purchase price of $46,657,350. The following table summarizes purchases of our Series H preferred stock by such related persons:

| Stockholder | Shares of Series H Preferred Stock | Total Purchase Price |
| --- | --- | --- |

| | | |
|---|---:|---:|
| Entities affiliated with Great Hill Partners[1][2] | 1,304,058 | 8,965,138 |
| Entities affiliated with PWP Growth Equity[1][3] | 709,555 | 4,878,049 |
| Entities affiliated with Greenspring Associates[1][4] | 436,376 | 2,999,998 |

(1) Holds more than 5% of our outstanding common stock.
(2) Entities affiliated with Great Hill Partners include Great Hill Equity Partners V, L.P. and Great Hill Investors, LLC. **Michael Kumin**, a member of our board of directors, is a Managing Partner of Great Hill Partners.
(3) Entities affiliated with PWP Growth Equity include PWP Growth Equity Fund II LP and PWP Growth Equity Fund II B LP. **Chip Baird**, a member of our board of directors, is the Co-head of PWP Growth Equity.
(4) Entities affiliated with Greenspring Associates include Greenspring Opportunities III, L.P., Greenspring Global Partners VII-A, L.P., Greenspring Global Partners VII-C, L.P., Greenspring Secondaries Fund III, L.P. and AU Special Investments, L.P.

### Investors' Rights Agreement

We are party to an investors' rights agreement, dated as of March 22, 2019 ("**IRA**"), between us and the holders of certain registrable securities which provides, among other things, that certain holders of our capital stock, including entities affiliated with Great Hill Partners, Canaan Partners, PWP Growth Equity, InterWest Partners and Greenspring Associates have the right to demand that we file a registration statement or request that their shares of our capital stock be covered by a registration statement that we are otherwise filing. ***Chip Baird, Maha Ibrahim and Michael Kumin, members of our board of directors, are or have been affiliated with PWP Growth Equity, Canaan Partners and Great Hill Partners, respectively. Julie Wainwright, our Chief Executive Officer and Chair of our board of directors, is a party to the IRA.*** Rita Sahi, the mother of Rati Sahi Levesque, one of our executive officers, is also a party to the IRA.

### Secondary Sales

Pursuant to certain of our equity compensation plans and certain agreements with our stockholders, including a right of first refusal and co-sale agreement, dated as of March 22, 2019, we or our assignees had a right to purchase shares of our capital stock which stockholders propose to sell to other parties. These rights terminated immediately prior to the completion of our initial public offering ("**IPO**"). In March 2019, we waived our right of first refusal in connection with the sale of certain

shares of our capital stock by certain of our stockholders, including Julie Wainwright, our Chief Executive Officer and Chair of our board of directors, to Greenspring Associates, who currently holds more than 5% of our outstanding common stock.

(Emphasis added).

190.    Moreover, as of April 2019, RealReal, led by defendant Wainwright had "raised a total of $288 million in funding from venture capital and private equity backers, including Great Hill Partners, Sandbridge Capital, PWP Growth Equity, Industry Ventures, Greycroft and Canaan. In July, the Company, which was founded in 2011, raised $115 million in funding, led by Perella Weinberg Partners, with participation from Sandbridge Capital and Great Hill Partners." https://www.pymnts.com/news/retail/2019/the-realreal-funding-luxury-consignment-shares-ipo/

191.    In addition, the entities associated with defendants Baird, Kumin and Ibrahim, and Baird and Ibrahim themselves, all profited from their relationship with defendant Wainwright and each other:

| NAME | POSITION | TYPE of SALE | DATE | AMOUNT of PROCEEDS |
|---|---|---|---|---|
| Baird Gilbert L III | Director | Indirect | July 02, 2019 | $7,450,330 |
| Canaan IX L.P. | Beneficial Owner of more than 10% of a Class of Security | Indirect | July 02, 2019 | $8,302,908 |
| Great Hill Equity Partners V, L.P. | Beneficial Owner of more than 10% of a Class of Security | Indirect | July 02, 2019 | $9,966,731 |
| Ibrahim Maha Saleh | Director | Indirect | July 02, 2019 | $8,302,908 |
| PWP Growth Equity Fund II LP | Beneficial Owner of more than 10% of a Class of Security | Indirect | July 02, 2019 | $7,450,330 |

## COUNT I
### BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS

192.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

193.    The Individual Defendants owed and owe RealReal fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe RealReal the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

194.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

195.    Each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that RealReal's authentication process and procedures were not as detailed or exacting as portrayed and as a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

196.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

197.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, RealReal has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

198.    Plaintiff, on behalf of RealReal, has no adequate remedy at law.

## COUNT II
### FOR FEDERAL CONTRIBUTION AGAINST ALL INDIVIDUAL DEFENDANTS

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

200.    All Defendants herein have been named as defendants in the Securities Class Action, in the United States District Court for the Northern District of California captioned *Sanders v. The RealReal, Inc.*, No. 5:19-cv-7737-EJD (N.D. Cal.).

201.    Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

202.    Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the class action as his own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and these Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

203.    Accordingly, Plaintiff asserts this claim derivatively for contribution, as provided by statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of RealReal and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.

D.  Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 7, 2020                              Respectfully Submitted,


                                                    */s/ Blake A. Bennett*_____
                                                    **COOCH AND TAYLOR, P.A.**
                                                    Blake A. Bennett (#5133)
                                                    The Nemours Building
                                                    1007 N. Orange Street, Suite 1120
                                                    Wilmington, Delaware 19801
                                                    Telephone: (302) 984-3800
                                                    Email: bbennett@coochtaylor.com

**OF COUNSEL**
HYNES & HERNANDEZ, LLC                              *Attorney for Plaintiff*
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041
Email: mhynes@hh-lawfirm.com
        lhernandez@hh-lawfirm.com

BRAGAR EAGEL & SQUIRE, P.C.
Garam Choe
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (646) 860-9449
Email: choe@bespc.com